IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

IN RE: TINA E. KISSELBURG, Debtor     No. 2:17-bk-73154
Chapter 7

TINA E. KISSELBURG     PLAINTIFF

v.     2:18-ap-7010

KEY BANK, N.A., U.S. DEPARTMENT OF EDUCATION,
CITIZENS BANK, GREAT LAKES HIGHER EDUCATION
CORP., AND JOHN DOES I, II, III, AND IV     DEFENDANTS

ORDER AND OPINION

On December 19, 2017, the debtor filed her chapter 7 bankruptcy case, and on February 22, 2018, filed this adversary proceeding against Key Bank, N.A. [Key Bank]; United States Department of Education [DOE]; Citizens Bank; Great Lakes Higher Education Corporation [Great Lakes]; and John Does I-IV.[1] In her complaint, the debtor seeks a determination that her student loan debts are dischargeable pursuant to 11 U.S.C. § 523(a)(8). The Court held a trial on February 27, 2019.[2] Donald A. Brady, Jr. appeared on behalf of the debtor. Curtis D. Clements appeared on behalf of Key Bank. At the conclusion of the trial, the Court took the matter under advisement. For the reasons stated below, the Court finds that the student loans owed by the debtor to Key Bank

---

[1] The debtor did not amend her complaint to name the John Does.

[2] DOE stipulated on April 20, 2018, that the debt owed to it was discharged and neither Citizens Bank nor Great Lakes answered the debtor's complaint. As a result, Key Bank was the only defendant that appeared at trial to contest the dischargeability of the debtor's student loan debt.

impose an undue hardship upon her and are discharged under § 523(a)(8).

**Facts**[3]

The debtor is currently 58 years of age and unemployed. During college, the debtor worked at various times as a substitute teacher, teacher's aide, and bus driver. In 1997, she earned $11,698, her highest annual income to date. In 2000, the debtor received her bachelor's degree in science. Also in 2000, the debtor and her then-husband initiated divorce proceedings. The debtor was last employed in the early 2000s as a bank teller making less than $8.00 per hour. She testified that her position at the bank was the highest paying job that she has ever held.

In or around 2002, the debtor enrolled in medical school at St. Matthews School of Medicine in the Cayman Islands. To fund her medical education, the debtor obtained student loans from several lenders including Key Bank. In 2006, the debtor earned her Doctor of Medicine [M.D.] degree. The same year, the debtor's divorce was finalized. As part of the property settlement with her ex-husband, the debtor received $98,000 in 401(k) funds that were rolled over into an IRA account in the debtor's name. Soon after her divorce was completed, the debtor withdrew a portion of the IRA funds to purchase the home in which she still lives.

According to the debtor, a medical school graduate must pass three board exams or "steps" and complete a residency program in order to become a licensed physician. The debtor testified that the exams are expensive to take, with some of them costing $1400. The debtor also testified that passing the first two steps is a prerequisite to any residency program.

---

[3] Unless otherwise stated, the facts in this section were derived from the debtor's testimony on February 27 and were not contradicted by Key Bank.

The debtor began preparing for her first board exam or, Step 1, in 2006. Ostensibly because she was no longer in school, the debtor's student loans came out of deferment and became delinquent sometime between 2006 and 2008. After the loans became delinquent, the debtor made two payments to Key Bank: one in the amount of $3400 and the other in the amount of $6800. The debtor testified that the money she paid to Key Bank was made up of insurance proceeds that she had received after her truck and motor home were damaged in a storm and money that she had made from selling some of her furniture and other personal items. In or around 2012, the debtor called Key Bank to request deferment of her student loans. The debtor said that after speaking with a Key Bank representative, she believed that the only way to defer her student loan payments was to enroll in educational classes. As a result, the debtor returned to school on a part-time basis in order to defer her student loan payments.

After more than six years of preparation and several unsuccessful attempts, the debtor passed Step 1 of her medical boards in 2013. In 2014, she received an associate's degree in child development and because she was no longer taking classes, her student loans once again came out of deferment. During 2014 and 2015, the debtor applied for numerous jobs, including teaching positions and teacher's aide jobs–both full and part time–in Barling, Greenwood, and Van Buren, Arkansas. She also applied to teach nursing at the University of Arkansas. In addition, the debtor inquired at an office about applying for an open position but was told not to waste her time by filling out an application because her degree in science was not a fit for the position. She also contacted daycare centers to see if any director positions were available but learned that most daycare centers are run by their owners. The debtor's efforts to find a job were unavailing–she received no offers.

In 2017, the debtor realized that she would not be able to attain her goal of becoming a doctor. Despite working with tutors that cost her son thousands of dollars and taking the Step 2 exam seven times from 2013 to 2017, the debtor simply could not pass the second

exam.[4] As a result of her inability to pass Step 2, the debtor cannot proceed to a residency program or take Step 3 and is ultimately precluded from becoming a medical doctor. Because she could not continue to pursue a career in medicine and felt discouraged by the fruitlessness of her job search in 2014 and 2015, the debtor testified that she felt "pretty low" when she filed her chapter 7 bankruptcy case on December 19, 2017, particularly in the light of her worsening health problems.

The debtor testified that she experiences left knee pain, numbness, and tingling that prevents her from walking up and down stairs. She also testified that she has back pain resulting from a herniated disc that prevents her from sitting comfortably for long periods of time. She said that although her back pain has been an ongoing problem for her since 2007, it was not an insurmountable one when she was studying for her medical boards because she could relieve some of the pain by frequently standing up and changing positions. However, the debtor can no longer employ movement as a method of mitigating her back pain because of additional health problems that have emerged during the past two months–specifically, dizziness, intense headaches, and vision disturbances.

The debtor testified that she began having problems with her vision on January 7, 2019, and was diagnosed with glaucoma on February 6, 2019.[5] As a result, the debtor said that her vision will continue to decline as time goes on and it will become increasingly

---

[4] The debtor testified that a candidate is allowed to take the Step 2 exam a maximum of seven times before being required to start the process over from the beginning. In other words, after failing Step 2 seven times, the debtor would have had to take and pass Step 1 again and then pass Step 2 in order to progress toward her goal of becoming a doctor.

[5] The Court has no medical documentation to confirm that the debtor has been definitively diagnosed with glaucoma and makes no finding on that issue in this opinion. However, based upon Court's observation of the debtor at trial, including her extreme–and the Court believes, genuine–distress when testifying about recent events concerning her vision, the Court is satisfied that the debtor has vision problems and they are serious.

difficult for her to read and drive. In fact, she testified that her vision has darkened in the few weeks since her diagnosis. Further, the debtor testified that she needs to have a colonoscopy as well as a CT scan to determine the source of recent pain that her physician believes could be related to her pancreas, gallbladder, or kidneys.

As of the date of the trial, the debtor estimated the balance of her IRA account to be approximately $20,000, testifying that over the past thirteen years, she has used the IRA funds to pay for one semester of medical school, various living expenses, property taxes and insurance, and a heating and air conditioning unit for her home. The debtor expects to further reduce her IRA balance to pay for her upcoming medical tests and bills because she has no health insurance. In addition, she testified that she will have to withdraw $2000 from the IRA to pay for repairs to her car–which has 140,000 miles on it–and anticipates withdrawing another $5000 to $6000 to repair the floor of her home, which she described as "collapsing." Based on these known future expenses combined with the debtor's uncertainty regarding how much her medical bills will total after the colonoscopy and CT scan, she believes that her IRA account will soon be totally depleted. She said that when her IRA is gone, she will apply for social security benefits. According to the Social Security Administration statement introduced at trial, the debtor will receive about $367 per month at full retirement age.

Although the debtor's son assists her financially from time to time, her only reliable income is $375 that a "boarder" has paid to her each month since 2008 to rent a room in her house. The debtor's monthly expenses total $388.31, with $100 of that amount going toward food. When questioned at trial about her ability to live on such a small food budget, the debtor testified that she gets additional food from a food bank called Helping Hands. Similarly, when asked about her $10 per month allocation for clothing, the debtor said she buys her clothing at garage sales. The debtor's additional monthly expenses are: $64 for homeowner's insurance; $90 for electricity, heat, and gas; $23 for water, sewer, and garbage collection; $25 for cell phone services; $20 for personal care products and services; $20 for transportation services such as gas and vehicle maintenance; and $36

for car insurance.

Key Bank acknowledged at trial that the debtor's expenses are minimal but argued that she could have done more to find employment by applying for retail jobs as well as lunchroom and groundskeeper positions at the schools to which she applied for teaching and teaching-related positions. The debtor testified that her physical limitations would prevent her from doing those types of jobs because they involve heavy lifting that she cannot do because of her back problems. Key Bank's attorney argued at trial–and the debtor agreed–that her financial picture would markedly improve if she could complete the steps required to become a licensed medical doctor. However, the debtor said that although she would have chosen to be a doctor, she no longer sees well enough to be able to study for or sit through the exams, she cannot afford to pay the exam fees, and even if she could, she cannot pass the exams. The debtor also testified that even if she passed the exams, residency programs prefer younger applicants that have more recently graduated from medical school and she believes that it would be difficult to find a residency program that would accept her.

Irrespective of the debtor's ability or inability to become a doctor, Key Bank contends that if the debtor is unable to pay all of her debt to Key Bank, she should have to pay back some of it. The debtor has ten separate student loans with Key Bank that currently total close to $284,000 and have monthly payments ranging from $21.09 to $398.25. The debtor said at trial that she might be able to make one of the lower monthly payments but she would "really have to have some help" to do so.

**Law & Analysis**

Section 523(a)(8) provides that student loans are not discharged in bankruptcy "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." To obtain a discharge of student loan debt, a debtor must prove by a preponderance of the evidence that repayment constitutes an undue hardship. *Parker v. Gen. Revenue Corp.* (*In re Parker*), 328 B.R. 548, 552 (B.A.P. 8th Cir. 2005).

Proving undue hardship requires more than a demonstration that it would be difficult for the debtor to repay the student loans. *Id.* at 553. The Eighth Circuit characterizes the debtor's burden under § 523(a)(8) as "rigorous." *Educ. Credit Mgmt. Corp. v. Jesperson (In re Jesperson)*, 571 F.3d 775, 779 (8th Cir. 2009).

Because § 523(a)(8) does not define undue hardship, "courts have devised their own methods of determining whether an undue hardship exists." *Conway v. Nat'l Collegiate Trust (In re Conway)*, 495 B.R. 416, 419 (B.A.P. 8th Cir. 2013). The Eighth Circuit employs a totality of the circumstances test that requires courts to evaluate the debtor's "past, present, and reasonably reliable future financial resources, the debtor's reasonable and necessary living expenses, and 'any other relevant facts and circumstances.'" *In re Jesperson,* 571 F.3d at 779 (quoting *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003)). "[I]f the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt–while still allowing for a minimal standard of living–then the debt should not be discharged." *In re Long*, 322 F.3d at 554-55. Generally, a minimal standard of living includes "the ability to pay for food, shelter, utilities, personal hygiene, clothing, medical and dental expenses, and recreation." *Johnson v. Sallie Mae, Inc. (In re Johnson)*, No. 5:13-ap-7010, 5:13-ap-7011, 2014 WL 7011097, at *3 (Bankr. W.D. Ark. Apr. 30, 2014) (citing *Shadwick v. U.S. Dept. of Educ. et al. (In re Shadwick)*, 341 B.R. 6, 11 (Bankr. W.D. Mo. 2006)). Accordingly, the Court will evaluate the totality of the circumstances to determine whether the debtor has the financial resources to maintain a minimal standard of living while also paying her student loan debts.

### I.     Past, Present, and Future Financial Resources

The debtor's past financial resources have been limited, at best. The current federal poverty guideline for a household of one is $12,490. At no time in her 58 years, has the debtor exceeded–or even met–that income level. She achieved her highest annual income of $11,698 in 1997, which was twenty-two years ago. The debtor currently has no job and scarce financial resources. Her only income for the past eleven years has been the

$375 per month paid to her by a boarder.  Although the debtor's son assists her financially when he can, the Court has no evidence to suggest that he is in a financial position to alleviate fully the effects of the debtor's financial straits.  Even with her son's help, the debtor is still required to frequent food banks to meet her basic needs and to withdraw money from her IRA account to cover unexpected expenses like medical tests and repairs to her home and car.  The debtor's main financial resource–her IRA–will soon be exhausted, at which time her financial picture will worsen.  Although the debtor will at some point in the future receive social security benefits, they will add only $367 to her monthly income.  Even assuming that the debtor's boarder continues to pay her $375 a month indefinitely, her social security benefits will raise her monthly income to just $742, equating to an annual income of $8904–a figure still well below the current poverty level.  For these reasons, the Court finds that the debtor has not and will not have the financial resources to repay her student loan debt to Key Bank.

## II.     Reasonable and Necessary Living Expenses

In order for expenses to be reasonable and necessary in the context of a § 523(a)(8) analysis, they must be "modest and commensurate with the debtor's resources."  *In re Jesperson*, 571 F.3d at 780 (citation omitted).  "While the total amount of monthly expenses must be reasonable, courts also scrutinize specific expenses to determine whether those expenses are unnecessary and excessive to the extent that funds can be reallocated to pay for the student loans the debtor seeks to discharge."  *In re Johnson*, 2014 WL 7011097, at *4.  In this case, the Court finds that the debtor has no unnecessary or excessive expenses.  The Court further finds that there are no funds in the debtor's budget available to pay even the lowest monthly payment of $21.09 to Key Bank.  *See Conway v. Nat'l Collegiate Trust* (*In re Conway*), 495 B.R. 416, 423 (B.A.P. 8th Cir. 2013) (if a debtor has multiple student loans, the court must separately determine the dischargeability of each loan).  Although the debtor reluctantly said on cross-examination that she could possibly get enough financial help to make one of the lower payments to Key Bank, her son (from whom the help she referenced would undoubtedly come) has no obligation to Key Bank.  Finally, in the event the debtor receives social security benefits

that would have the effect of increasing her monthly income to $742, those "extra" funds would need to be allocated toward meeting the debtor's basic needs such as food, clothing, and repairs to her home and vehicle after her IRA is depleted.

### III. Other Facts and Circumstances

In undertaking an undue hardship analysis, courts in the Eighth Circuit must consider all relevant facts and circumstances in addition to reviewing the debtor's current and future financial resources and expenses. *In re Jesperson*, 571 F.3d at 784. Additional circumstances considered in the determination of undue hardship include, but are not limited to:

> (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of study; (7) whether the debtor has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness.

*Id.* (quoting *McLaughlin v. U.S. Funds* (*In re McLaughlin*), 359 B.R. 746, 750 (Bankr. W.D. Mo. 2007)). The Court will briefly address the additional factors that it finds applicable in this case.

The Court finds that the debtor's inability to find employment and, by extension, pay her debt is due to factors that are largely outside the debtor's control. The debtor has back problems, issues with her left knee, and a vision problem that already impairs her sight and will cause it to decline further in the future. In addition, the evidence before the Court is that the debtor tried for many years to pass the exams necessary to become a doctor but–for whatever reason–she repeatedly failed the exams, even with the help of tutors. Because of her inability to pass the exams, the debtor will never be able to find employment as a medical doctor because she cannot meet the legal requirements to do so.

9

Further, the Court finds that although the debtor has not made regular payments to Key Bank, she did make two substantial payments of $3400 and $6800 when the loans first became delinquent, which the Court believes is some evidence that the debtor both desired and intended to repay the loans. In addition, the debtor tried to obtain a deferment from Key Bank but was told only to enroll in more classes. As Key Bank's attorney recognized at trial and the Court already discussed above, the debtor has made a good faith effort to minimize her expenses. Likewise, the Court finds that the debtor's testimony regarding her unsuccessful job search to be credible–she attempted to maximize her income but could not find a job. Although the debtor has not sought employment in recent years, there is no reason to believe that the debtor would be more employable now than she was when she last looked for a job in 2015. In fact, she is probably less employable at this juncture because her health has declined. Finally, although there is no dispute that most of the debtor's debt is made up of student loans, the Court finds nothing nefarious about that fact in this case: the debtor failed Step 2 of her medical boards for the seventh and final time in October 2017 and filed bankruptcy two months later in the face of the overwhelming student loan debt that she had incurred trying to attain a goal that she had just learned was unreachable.

**Conclusion**

For all of the above stated reasons, the Court finds that it would impose an undue hardship upon the debtor to repay her student loans to Key Bank. Therefore, the Court finds that the debts are discharged in their entirety under 11 U.S.C. § 523(a)(8). The Court will enter a separate judgment in accordance with this order.

IT IS SO ORDERED.

*[Signature]*
Ben Barry
United States Bankruptcy Judge
Dated: 03/12/2019

cc:   Donald A. Brady, Jr., attorney for the debtor
      Curtis D. Clements, attorney for Key Bank
      R. Ray Fulmer, II, chapter 7 trustee
      United States Trustee